Thank you, Your Honor. Good morning. May it please the Court. My name is Lisa Anderson and I represent the petitioner, Karina Santiago-Duran. If I may, I would like to reserve two minutes for a rebuttal. Keep your eye on the clock. We'll try to help you. Appreciate that. The essential question in this case is the same as that presented in Velasquez-Escobar v. Holder. Did the Board of Immigration Appeals abuse its discretion when it decided that Ms. Santiago-Duran was not entitled to notice of the removal proceedings against her under the immigration statutes? As in Velasquez, which is almost on all fours with this case, the answer is a resounding yes. Moreover, this case should not just be reopened, but this case should be terminated. Not only was Ms. Santiago-Duran wrongfully deprived of notice of her hearing, but the Court's jurisdiction never vested because the NTA, which contained an address apparently made up out of thin air, cannot be considered. Let me just be sure I understand. In the proceedings before the IJ, did you allege that your client gave her current address to the DHS on October 28, 1998? Yes, Your Honor. She gave her address in Inglewood, which was the only address that she had. Okay, and is that the same address that you would give today? She still lives in Inglewood. She lives on a different street. But she wasn't there. She was in Mexico. She was in Mexico, but she was in Mexico for a brief visit. She had been residing in the United States for the past six years, since the age of 15, when she was brought to the United States. She would be a DACA recipient if she hadn't aged out. But she was on a brief visit to Mexico. She did not have a residence there, and she gave them the only residence she had, which is where her two U.S. citizen children and the father of those children live. She gave two different addresses. So the first time she was determined to be crossing the border unlawfully in San Ysidro, she gave an address in Coladolfo López Matias No. 107 Tepecayarit, Mexico. And the second time she crossed over again the next day, in Calexico, she gave the address of 10712 Dale Rosa Avenue, Inglewood, California. So were both of those addresses her address that the AIA, that the government should have been aware of? It's not clear, Your Honor. I think there are some fundamental problems with the preparation of both of the I-213s. The I-213s have a lot of discrepancies between them, such as her height, her weight, the color of her hair, her address, her employment. So it's not entirely clear that they applied to the same person, although there are some similarities. I mean, it's not clear what her address was? Because we have two under the same name, like a couple of days or a day apart, with two different addresses? I believe that the only one that we can rely on is the one from October 28th, which is the one that the immigration judge used in the removal proceedings, and that is the Dale Rose address. They both have the same A number. So I guess my question as to why they aren't both applicable or inapplicable. I think that there were some problems in the preparations of the I-213, and I don't think that we can rely on either I-213 as a result. Wait a minute. You say there were some problems in preparing it. As Judge Ikuda points out, there are some aspects of this proceeding, of course, that can be complicated, but one's address is not one of them. And both these forms had her name and asked for her address. She gave two different addresses. What's the problem with that? The court can only rely on the most recent address that she gave. The Mexican one or the other one? It's the one in Inglewood. It's the Dale Rose Avenue. And what do you rely upon for saying that the court can only rely upon the later address? Because I believe that the notice to appear requires that the most recent address given by the alien be the address used. And in fact, I believe that counsel for the government made that argument in her brief, stating that temporarily that was the appropriate I-213 to rely on. I agree with her on that point. So there really isn't any rule that says that, but you're saying common sense or something like that is what you're saying. That's correct. So here she was handed the notice to appear. It had an address on it. There's a regulatory requirement that she correct it if it's incorrect, and she didn't do that. And here the BIA, in fact, references that there's this requirement and references Velazquez-Escobar. Whereas in Velazquez-Escobar, I think the court made a point of saying that the BIA didn't rely on it. So under SEC v. Chainery, we can't overturn the BIA's determination on that basis. So why wasn't the BIA correct here to say she didn't do what she was supposed to do, which is to correct the NTA as required in the regulation? Your Honor, I believe that Velazquez found two issues with the argument of the government that she was required to correct them. And while the first one, absolutely, you are correct, is that the regulation requires her to correct the address. However, in Velazquez, they found that there was a second reason. And that is because the NTA itself never mentions Section 100-1003.15 that puts her on notice that she needs to inform the government. So is there a regulation that requires the NTA to give her notice? Is there some regulation that says that, or is there some law or legal principle that requires it? Not as far as I'm aware, but Velazquez is very clear that nothing in the advisal mentions or fairly implies any continuing duty, much less a continuing duty to correct the government. Once the alien provides an address, the alien's work is done. But the alien didn't correct the address here, right? And the regulation actually doesn't say you just have to provide an address. The regulation says if the address on the notice to appear is incorrect, then the alien has to provide the correct address to the immigration court. So the address on the notice to appear is incorrect, I take it, but the alien didn't provide to the immigration court the correct address. So the alien didn't comply with the applicable regulation here, is that correct? Your Honor, my understanding is that the alien has to provide the immigration inspector with the correct address. I'm looking at the regulation. Do you have that in front of you? It's 1003.15d1. And so my question is whether the petitioner here complied with the regulation. She did not comply with the regulation in correcting it, but I believe that Velazquez does not require her to comply with the regulation. Let me ask you, the government says in its briefs that it was your client who provided all the addresses. Is that something you dispute? Absolutely, Your Honor. There is absolutely nowhere that includes this address, the Q. Kaye 3rd. I don't know where that came from. It looks like it came out of thin air. How are we supposed to decide that your client did or did not provide it when it's on the form that she was given? It's not on the I-213. It's not in the sworn statement. I just said the I-213s were not reliable, that there were problems with inconsistency. So they're not reliable, so that shouldn't be relevant to our consideration of the addresses. The fact that they're not reliable, it requires proceedings to be terminated. In immigration court, when an applicant doesn't appear for proceedings, and I was an immigration and naturalization service prosecutor in 1999, so I did hundreds, possibly thousands of in absentia cases exactly on point. We have the I-213. The judge does not have the I-213. And we are asked to review the I-213 and see if it's reliable, if it establishes by clear, unequivocal, and convincing evidence that notice was given to the respondent. Well, she was handed the NTA, I understand. She was actually hand-delivered and handed. So she had the NTA in her hands. It had the address that you're now saying is erroneous. And the regulation required her to correct it, and she didn't do it. And we don't know what the correct address is because the I-213s, they are unreliable. And because the I-213 was unreliable, she couldn't be charged with being... Counsel, with respect, you're not answering Judge Ikuda's question. She's asked you about your clients having received the NTA with the instruction that if there were a change in address, she needed to provide that. There's nothing in the I-213 that has anything to do with that, is there? There is not. Or the regulation that Judge Ikuda cited. The NTA only refers to her obligation to inform the court of her change of address. She didn't change her address. Her address remains... We don't know what her address is, according to you, because the I-213s are not reliable. So, we don't know. We don't know if there was a change or not a change. We have no idea what the address was, nor does the government. And the regulation requires her to inform the court of her address. This is what is confusing to me. Yes, but the regulation is not... She had no notice of the regulation. Is she not bound by it, nonetheless? Your Honor, according to the Board of Immigration Appeals, aliens cannot be held to the two statutory obligations unless the government gives them notice of those obligations. And so she got the NTA that told her what she had to do. The regulation backs that up. What are we missing here? There's a distinction between the regulation and the NTA. You want to save the rest of your time? It's up to you. But you said you wanted to save some rebuttal time. Yes, Your Honor. I will reserve for rebuttal. Very well. All right. Ms. Otunla, representing the government. Yes. Good morning, Your Honors. May it please the Court. Anita Otunla for the Attorney General. As Your Honor has mentioned, the seminal question here is whether Ms. Santiago is responsible for the failure to receive this properly sent hearing notice. And since the hearing notice was sent to the address Ms. Santiago provided in the NTA, the answer is yes. And not only that, but the record... Let me stop you. Let me stop you. What is your evidence in the record that she provided the address that was used in the NTA? Two... I have two responses to that, Your Honor. The first is that, one, there is a presumption of regularity that government or agencies have. There's nothing... And two, the burden is on Ms. Santiago to show that she didn't. So normally, and Velasco speaks to this, normally when a petitioner is seeking to reopen, it's a high burden. And there would be an affidavit or a declaration explaining what happened or explaining, as in Velasco's, that Ms. Velasco said she gave the old address. She told the DHS or Immigration that she lived there. And then she also said she had moved. And through some error on the part of DHS, the NTA, or rather the hearing notice, was sent to the wrong address. In this case, the record is devoid of any evidence. Ms. Santiago, rather, does not say whether or not she gave that address or there was some other address. The affidavit would have shed some light on that. And this panel there says that without any declaration from her or any supporting evidence, there's not so much as any receipts or bills, any retail mail even, attached to this motion to reopen, showing that the Ingleside address was the one that she was receiving mail at and that's the one that she gave to DHS. As Your Honors mentioned, the NTA put her on notice. She was personally served, this NTA. The obligation attached at that point for Ms. Santiago to inform the court. My friend opposing counsel says that there was no change of address. But if Ms. Santiago had the NTA, she would have known that the address on it was not her current address. If she's saying that that was a wrong address or an old address. So the obligation still would have attached. And she was obligated to inform DHS or the Immigration Court that that was not her current address. The government cannot be expected to provide a hearing notice to an individual when the correct address hasn't been given. And that's why the responsibility for this current or the correct address is on petitioner. Counsel, let me ask you this. The address in Mexico that the government intends was the one given was incorrectly noted in what was sent there. I get referred to Mexicali or something like that. That's not the petitioner's fault, is it? No, Your Honor. That, I agree, is not petitioner's fault. So if we take the government's position that the latest address provided to the government was the one in Mexico as opposed to the one in Inglewood. But the government copied the information down incorrectly and it was never received. Isn't that the government's fault? So, Your Honor, two responses. I would say if it sounds like your question is in Velazquez where the government did copy the information wrong, then there might be that situation. But the hearing notice that went to Ms. Velazquez was not facially defective. Excuse me, I misunderstood. I thought, and I should have this right in front of me, but I thought that the address given showed the address as being Mexicali, which is the capital of the Mexican state of Baja California. And Sonora, where she was supposed to be, is the correct address. Let's just say arguendo. If she put down an address and the government says we're relying on that address, but it copied it down wrong, what do we do with that? So, assuming arguendo, Your Honor, which I'm not conceding is the facts of this case, that, I would say, would be in line with Velazquez. where petitioner gave the correct address, DHS sent the hearing notice through some administrative error or some irregularity to another address, then that would be, you know, this court has said that with the fact that petitioner in that case submitted an affidavit and filed a motion to reopen within six months of that order to removal. Here, this is not the case. Not only was it the correct address, Your Honor, but there's no affidavit explaining anything whatsoever about this, you know, the address or any kind of irregularity. But petitioner waited over 17 years when she had been personally served this NTA. So, Ms. Santiago knew that there was some immigration case or something going on, and she chose instead to bury her head under the sand. And that's not Velazquez, Your Honor. Velazquez chose there was some due diligence. There was this affidavit. And so, the panel, the Ninth Circuit held that under those circumstances, notice had not been provided to petitioner. And Velazquez, I might note, Your Honor, it doesn't actually discuss or address the fact that Ms. Velazquez was personally handed this NTA with the wrong address and chose, for whatever reasons, not to change it. Velazquez doesn't answer that question, which seems to be— Is it the government's position, then, that even if the government wrote down the wrong address, eventually, Ms. Santiago Durán received the notice. She was told that there was a problem. Instead of doing something at the time to say, wait a minute, you sent it to the wrong address, this is where I live, here's some information showing that's the case, she just didn't do anything until it was too late. Is that correct? I believe, if I'm understanding, Your Honor, then yes. Because the obligation requires Ms. Santiago, where she's personally served, the obligation attaches for her to correct the NTA or correct the hearing notice for that address. There's no other way. There's no other way for the government to go about knowing where and when to provide notice. Even though, like Judge Ikuta says, the government does have an obligation under 8 CFR 1003.15 and under 8 U.S.C. 1229 to provide notice to petitioners of their immigration proceedings, Your Honor. If Your Honors have additional questions, I guess I would just refer or decide to rely on the briefs. Very well. Any questions by my colleague? I do. I do. Is it the government's position that the person does not need to actually know about their obligation to provide the change of address if they see one is incorrect in the NTA? That's correct, Your Honor. The person doesn't need to have been informed of a regulation or a statute that binds them. Although, I will point out the NTA, which she was personally served, does, in fact, paraphrase or include that notice and that obligation on the back. And that was the case in this scenario. The NTA does specifically state the obligation to immediately inform the court of any address change, updates, and petitioner was informed in Spanish language, which is her best language, of this obligation. That's not what the form says. Oh, I believe she did check. The form is checked in terms of, Your Honor, that is page 81 of the record. The certificate of service box says it was served in person and she was provided with oral notice in the Spanish language. At the time and place of his or her hearing and the consequences for failure to appear. She couldn't have been provided the notice of the consequences of the first part in terms of the time and place because that hadn't been set, so we know that's not true. It doesn't say anything that the Spanish included the notice of the obligation to correct an address. So if I may refer, Your Honor, to the page before that, page 80, you're absolutely correct. There's no date in the NTA, but it does say that she's been ordered to appear before an IJ at the Imperial California Court. So she knew that that would be where the hearing was, and she knew there was an immigration proceeding against her, Your Honor. She was personally served. And that's the difference between the NTA and the NOH because I gather that the NOH notice was corrected, right? She was given the correct address before that proceeding took place. Yes, Your Honor, and that's what I meant, which I may have been inarticulate about. That address in the NOH was not visually defective. It was corrected so that it went to the correct—it was addressed to the correct state, city, and correlating state. There wasn't a conflict between the state and city in the notice of hearing. Other questions by my colleagues? I actually have one other question. The opposing counsel talks about and mentions in the brief that the proceeding should be terminated, and the government cited 1225B2A and 8 CFR 235B saying that being outside of the country, being removed outside the country, is considered detained for a proceeding. So can you address the argument that the proceeding should be terminated and you're relying on 235B? Yes, Your Honor. So that statute does provide that an alien who's arriving shall return to this territory pending a proceeding. And that is the—that is an effective or that is a current—not only was it current at the time in 1998 or 1999, but it still is a statute, a current statute today. What is your evidence that the person, even though removed to Mexico or having left Mexico, is still deemed to be within the country? Or what does that—what legal effect does that have? So if I'm understanding you right, it is a legal fiction that a person is still—would still be in the U.S. even though they've been returned to Mexico. But—and so petitioner claims that termination should have been the case based on Sanchez. But Sanchez doesn't really shed any light or can't be applied here because Sanchez was a pre-1996 proceeding where back then proceedings were exclusionary and deportation. And as opposed to now, since IHRA, in 1996, there are removal hearings. And so the statute in Sanchez is different from the statute here in Ms. Santiago's case. And so termination couldn't be the applicable outcome. The immigration judge—there are specific circumstances whereby an immigration judge can terminate proceedings. And this is—the location of an individual isn't one of them. The Ninth Circuit has an unpublished case, Fortz v. Whittaker. I believe it's a 2018 decision where a petitioner had voluntarily returned to Mexico. And the Ninth Circuit, relying on not the same statute, but said that termination wasn't valid. And a petitioner can't be in control of sort of when and where, or can't control the start or end of proceeding by their location. And so in Fort v. Whittaker, which I believe is cited in our briefs, petitioner—the Ninth Circuit held that even though a petitioner wasn't in the U.S., that termination was not appropriate and that the hearing notice had been improperly served on a petitioner. And there are other board pieces, Your Honor, that talk about termination of proceedings. And none of them suggest that a petitioner's location, whether it's in the U.S. or in Mexico or in a contiguous territory, would dictate termination of proceedings. Very well. Other questions by my colleague? All right. Thank you very much. Appreciate it. All right, Ms. Anderson, you have some rebuttal time. Thank you, Your Honor. First, as a point of clarification, on the I-213 on which the Mexican address is listed, it's a radically different address. It's Colonel Adolfo Lopez Mateos, number 107, Tippec, Nayarit, Mexico, which is extremely different than this Avenue Q, Calle 3, Caborca, Sonora, Mexico. And there's no evidence. Ms. Santiago was born in Sonora, but there is no evidence as to where they got the street name, the Avenue Q. The opposing counsel says that it's petitioner's burden to show what the wrong address, the right addresses are. Here we have three addresses. There's no declarations or affidavits. That's my understanding of the government's argument. So how do we know which of these three addresses was the correct address, if any? Your Honor, the only correct address was the address in Inglewood. And on the face of it, an affidavit, I don't believe, would have been necessary in this case where it was so facially defective. So what was wrong with the one with the address she gave on the I-213 for San Ysidro? Why do you say it's the one with the Inglewood? Because that was the day afterwards? That's correct, Your Honor, because it was more recent. So you have a rule of the most recent, but there's no regulation to that effect. Frankly, Your Honor, we would have been happy with either one. My assumption is that the address in Tepic, Nayarit, was an address at which she could receive mail. But that's not the address. Is that in the record? I mean, we don't know, right? We don't know, but it's the address that she apparently gave. Counsel, let me just kind of wind up here. You referred to Velazquez-Escobar a few times. That has a two-prong requirement. In what way does your client report to have complied with Velazquez-Escobar? She complied with Velazquez-Escobar by giving her correct address. When? I believe, both times on the I-213s, the Mexican address was likely an address at which she could be reached. But we can't rely on those. You've told us that. It's the only address that would possibly be able to be used. But most importantly, the government cannot rely on a regulation when it hasn't given the respondent notice of that regulation. I think that that's very clear in Velazquez, where they say even aliens who have been served in NTA cannot be held to the address obligation in the regulation because the NTA does not mention it. Thus, even if the BIA relied on that, the BIA's own precedence, their own precedent law in REGYR compels them to reverse. Okay. Do either of my colleagues have additional questions for Ms. Anderson? No. No, thank you. Thanks to both counsel. Your arguments have been very helpful in this case. The case of Santiago Duran v. Garland is submitted, and the court stands adjourned for the day.
judges: M. Smith, Ikuta, Steele